UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

HENRY BENITEZ,

                                        Plaintiff,

                                                          9:04-CV-1159
v.                                                        (NAM/GHL)

HAM, et al.,

                                        Defendants.
_____

APPEARANCES:                                    OF COUNSEL:

HENRY BENITEZ, 97-A-2553
Plaintiff *pro se*
Upstate Correctional Facility
P.O. Box 2000
309 Bare Hill Road
Malone, New York 12953

HON. ANDREW M. CUOMO                            TIMOTHY P. MULVEY, ESQ.
Attorney General for the State of New York
  Counsel for Defendants
615 Erie Boulevard West, Suite 102
Syracuse, New York 13204-2455

GEORGE H. LOWE, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable Norman A. Mordue,

Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

Plaintiff Henry Benitez alleges that 21 employees of the New York Department of Correctional

Services ("DOCS") violated his constitutional rights by subjecting him to excessive force,

denying him medical care, falsifying misbehavior reports, denying him assistance to prepare for a

disciplinary hearing, and imposing a loaf diet on him as punishment.  Currently pending before

the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil

Procedure 56.  (Dkt. No. 92.)  For the reasons that follow, I recommend that Defendants' motion

be granted in part and denied in part.

## I.    FACTUAL AND PROCEDURAL SUMMARY

Unless otherwise noted, the facts in this summary are taken from Plaintiff's verified

complaint[1].  Plaintiff, a New York state prisoner, was transferred to Upstate Correctional Facility

on September 14, 2002.  (Dkt. No. 1 ¶ 8.)  Plaintiff alleges that he was suffering from "ongoing

severe pain in his left hand wrist and right foot ankle due to nerve damage."  (Dkt. No. 1 ¶ 9.)

From the time he arrived at Upstate, he made "numerous requests" to Defendant Drs. Evelyn

Weissman and Richards to receive a medication called Atarax that had been prescribed to him

previously at Auburn Correctional Facility, an MRI of his left wrist and right ankle, and a referral

to an orthopedist.  (Dkt. No. 1 ¶ 12.)  Plaintiff alleges that Defendants Weissman and Richards

refused his requests for Atarax, the MRI, and the referral "in retaliation for his having filed

numerous formal grievances against them [and other Upstate medical staff members] within a

period of two years, and for the purpose of preventing [Plaintiff] from demonstrating in a civil

rights action against prison officials the extent of the injuries of his left hand and right foot."

(Dkt. No. 1 ¶ 12-13.) Plaintiff alleges that, as a result, he continues to experience severe pain in

his left wrist and right ankle, numbness in different areas of his left hand and right foot, an

inability to walk or stand for longer than ten minutes, and ongoing severe body itch.  (Dkt. No. 1

---

[1]    Only two of the named Defendants filed affidavits supporting Defendants' motion
for summary judgment.  Only one of those affidavits - the affidavit of Defendant Dr. Evelyn
Weissman - contradicts Plaintiff's version of events.

¶ 14.)

Regarding Plaintiff's requests for Atarax, Dr. Weissman declares that Atarax is

> non-formulary, which means we do not regularly stock that
> medication, and special approval must be obtained to issue that
> medication.  However, Vistaril and Hydroxyzine is the substitute we
> use for the same purpose as Atarax.  Hydroxyzine is the generic form
> of Atarax.  I prescribed Vistaril for [P]laintiff on October 2, 2002 . .
> . Dr. Richards requested approval for Atarax in April 2004 and it was
> suggested that [P]laintiff try Claritin, which had become a formulary
> (regularly stocked) drug.  Dr. Richards requested approval for Atarax
> again in June 2004, and the response was that if the generic
> (Hydroxyzine) had not worked, it was unclear that the branded drug
> Atarax would work . . . Plaintiff's complaints of itching were not
> ignored, and he [was] constantly given medication for itching.

(Weissman Aff. ¶¶ 4-10.)

As to Plaintiff's other claims, Dr. Weissman declares:

> Regarding [P]laintiff's claim that his request for an MRI was denied,
> Dr. Richards and I felt, in our medical judgment, an MRI was not
> warranted.  However, because his pain and numbness was improving
> with time, Dr. Richards requested, and I approved, physical therapy
> for [P]laintiff beginning in January 2003.  Regarding [P]laintiff's
> claim that his request for an orthopedic consult was denied, that is
> incorrect.  Dr. Richards requested an orthopedic consult for [P]laintiff
> on August 19, 2003 and [P]laintiff saw an orthopedist on September
> 4, 2003.  The orthopedist . . . did not suggest an MRI and determined
> that [P]laintiff was improving and ". . . there is not much else that I
> can suggest for Henry to improve or accelerate his healing.  For the
> time being, I am just going to suggest that he be patient."

(Weissman Aff. ¶¶ 11-13.)

Plaintiff was transferred to Elmira Correctional Facility Reception Center on November

7, 2002, for a court appearance.  Upon arrival, Plaintiff informed Defendant Correction Officer

Ham that he suffered "ongoing severe pain in his left hand wrist and right foot ankle due to nerve

damage, and that the handcuffs and leg irons . . . were too tight and causing him swelling and

3

enormous pain."  Ham observed that Plaintiff's hands were swollen.  However, he refused to remove or loosen the restraints.  Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred to Five Points Correctional Facility three hours later.  (Dkt. No. 1 ¶ 9.)

Plaintiff was returned to the Elmira Correctional Facility Reception Center on November 14, 2002.  At that time, Plaintiff again informed Defendant Ham that the restraints were too tight and were causing him swelling and extreme pain.  Defendant Ham "again verbally acknowledged that [Plaintiff]'s hands were . . . swollen" but refused to remove the restraints.  Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred out of the facility three hours later.  (Dkt. No. 1 ¶ 10.)

On January 2, 2003, Defendant Correction Officers Nephew and Desotelle strip-frisked Plaintiff[2] in preparation for transferring Plaintiff for a court appearance.  Defendant Sgt. Snyder was also in the room.  When they had completed the search, Defendant Nephew ordered Plaintiff

---

[2]       Plaintiff does not allege that the strip-frisk violated his constitutional rights.  Even if he did, I would find that such a claim would not survive *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).  Strip searches conducted in a prison setting are constitutional if they are reasonably related to a legitimate penological goal and are conducted in a reasonable manner. *Frazier v. Ward*, 528 F. Supp. 80, 81 (N.D.N.Y. 1981).  "However, a strip search is unconstitutional if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish.  *See, e.g.,Iqbal v. Hasty*, 490 F.3d 143, 172 (2d Cir. 2007)(pretrial detainee alleged Fourth Amendment violation where he was subjected to repeated strip and body cavity searches that were not related to legitimate government purposes and designed to punish); *Covino*, 967 F.2d at 80 (strip search accompanied by physical and verbal abuse is unconstitutional); *Hodges v. Stanley*, 712 F.2d 34, 35-36 (2d Cir. 1983) (second strip search performed soon after a first strip search served no legitimate interest when prisoner was under continuous escort); *Jean-Laurent v. Wilkerson*, 438 F. Supp. 2d 318, 323 (S.D.N.Y.2006)." *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, at *1, 2008 WL 1787692, at *9 (E.D.N.Y. Apr. 17, 2008).  Plaintiff does not allege, and the evidence does not show, that Defendants conducted the strip-frisk with an intent to intimidate, harass, or punish Plaintiff.

to put on his coat.  Plaintiff told Nephew that wearing the coat would "severely aggravate his continuing body itch stemming from his hepatitis virus."  (Dkt. No. 1 ¶ 15.)  Defendant Snyder called Plaintiff a "spick" and threatened to forcibly put the coat on Plaintiff.  Plaintiff told Defendants Snyder, Nephew, and Desotelle that he would sue them if they used force.  (Dkt. No. 1 ¶ 15.)

Shortly thereafter, Defendant Lt. Wright approached Plaintiff and asked him if he had spit at staff.  Before Plaintiff could respond, Defendant Wright ordered several guards to get a video camera and put a "spittle mask" on Plaintiff.  After the guards did so, Defendant Wright escorted Plaintiff to his cell.  He asked Plaintiff to explain what had happened in the frisk room.  Plaintiff said that Defendant Wright would not believe his account of the incident, accused Defendant Wright of interfering with his court trip and unjustifiably putting a spittle mask on him, and said he would sue Defendants Wright and Snyder.  Defendant Wright told Plaintiff that "transportation vans don't have cameras.  You're going to learn not to spit . . . [at] staff and . . . threaten us with lawsuits." (Dkt. No. 1 ¶ 16.)

After Defendant Wright left Plaintiff's cell, Defendant Capt. Bezio approached and asked Plaintiff to explain what happened in the frisk room.  Plaintiff told Defendant Bezio what had happened, denied that he had threatened to spit at a staff member, and asked Defendant Bezio to protect him while he was being transported to court.  Defendant Bezio told Plaintiff to be "up and ready to go to court" and that "people don't like to get spat . . . on."[3]  (Dkt. No. 1 ¶ 19.)

---

[3]      In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Bezio for these statements because (1) Plaintiff did not exhaust his administrative remedies regarding the statements; and (2) threats are not actionable constitutional violations.  (Dkt. No. 92-10 at 35-36.)  In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Bezio based on the

On January 3, 2003, Defendant Correction Officer Duprat escorted Plaintiff to the

transportation van.  Defendant Duprat told Plaintiff to "remember what we told you about the

van."[4]  As they were walking, Plaintiff saw Defendant Bezio and told him that Defendant Duprat

had threatened to "employ physical abuse" against him in the van.  Defendant Bezio shrugged his

shoulders.  (Dkt. No. 1 ¶ 20.)  Defendant Duprat drove Plaintiff in a van to a different building,

where he called Defendant Snyder "to arrange a beating" of Plaintiff.  After the phone call,

Defendant Duprat drove Plaintiff back to the first building.  When they arrived, Defendant

Snyder entered the rear section of the van and told Plaintiff that "you like . . . suing us.  Wright,

my boss, doesn't like that and sent this as a reminder."  Defendant Snyder then punched and

slapped Plaintiff, who was in handcuffs and leg irons, in the face and the back of his head,

knocking him unconscious.  When Plaintiff revived, Defendants Duprat and Correction Officer

Bogett entered the rear section of the van and punched and slapped Plaintiff several times in the

head, chest, and right ear.  When Plaintiff began to bleed from his right inner ear, Defendants

Duprat and Bogett tied a spittle mask on Plaintiff's head.  (Dkt. No. 1 ¶¶ 21-22.)

When Plaintiff arrived at Five Points Correctional Facility later that day, he notified

---

statements.  Rather, he included this allegation in his complaint to provide relevant information
for his failure to intervene claim.  (Dkt. No. 109 at 48.)  Therefore, I will not address Defendants'
arguments regarding these statements.

[4]      In their motion for summary judgment, Defendants argue that Plaintiff cannot
maintain a claim against Defendant Duprat for this statement because (1) Plaintiff did not
exhaust his administrative remedies regarding the statement; and (2) threats are not actionable
constitutional violations.  (Dkt. No. 92-10 at 35-36.)  In his opposition to the motion, Plaintiff
states that he did not intend to maintain a separate claim against Defendant Duprat based on the
statement.  Rather, he included it in his complaint to provide relevant information for his
excessive force claim.  (Dkt. No. 109 at 48.)  Therefore, I will not address Defendants'
arguments regarding these statements.

Defendant Nurse Hensel that he had been bleeding from his inner right ear due to a beating by Upstate officials, that he was suffering severe pain in his head and right ear, and that he wanted to be examined by a doctor.  Defendant Hensel refused to examine Plaintiff, made no record of his complaints, and refused to schedule Plaintiff to see a doctor.[5]  (Dkt. No. 1 ¶ 23.)

Plaintiff's medical record from Five Points indicates that on January 3, 2003, the day he arrived, Plaintiff was seen by Nurse Nancy O'Connor Ryerson.  She noted that Plaintiff arrived via van with cuffs and chains and spit net, and that he complained of pain and itching.  "It was noted that he takes Naprosyn and Benadryl, and he was escorted to 12 Building.  Apparently Naprosyn was not sent with him and it is a medication for which he would need a prescription from a doctor.  Since this was not an emergency, the procedure is to place the inmate on the regular physician call-out list for an appointment.  Nurse Ryerson also noted that he was Hepatitis C positive."  (Bannister Aff. ¶ 5.)

On January 4, 2003, Plaintiff notified Defendant Nurse Goodwin[6] that he needed emergency medical treatment because of severe pain in his liver, left wrist, and right ear, and that he wanted medicine for his severe body itch.  Defendant Goodwin refused to examine Plaintiff, made no record of his complaints, and did not provide any treatment to Plaintiff.  (Dkt. No. 1 ¶

---

[5]     The medical records produced by Defendants in support of their motion for summary judgment do not reflect that Plaintiff saw Nurse Hensel on January 3, 2003.  However, as the Court has noted previously (Dkt. No. 99 at 3), a SHU log book entry for January 3, 2003, indicates that Plaintiff was "taken to strip frisk room for pictures and to be assessed by R/N Hensel."  (Defs.' Resp. to P.'s 1st Req. for Prod. of Docs., Ex. E at 11.)  This document corroborates Plaintiff's claim that he saw Defendant Hensel on January 3, 2003.  I note, however, that none of the parties included the log book entry in their moving or opposing papers.

[6]     The complaint refers to this defendant as Nurse "Good."  However, Defendants state that her name is actually Goodwin.  (Dkt. No. 92-10 at 1 n.1.)  I will refer to her as Nurse Goodwin.

24.)

Plaintiff's medical records from Five Points indicate that on January 4, 2003, Plaintiff was seen by Nurse "Goon" at his cell after security staff told the nurse that Plaintiff stated his asthma was acting up.  Nurse "Goon"'s note indicated that Plaintiff never acknowledged shortness of breath and that she checked Plaintiff's transfer form and the computer and found that he had no history of asthma.  (Bannister Aff. ¶ 6.)

On January 5, 2003, Plaintiff alleges that he informed Defendant Nurse Kuhlman[7] that he had been bleeding from his inner right ear and that he was suffering from an ongoing, extreme body itch due to his hepatitis C and B virus.  Defendant Kuhlman told Plaintiff that she would review his medical chart and return to him.  Defendant Kuhlman refused to examine Plaintiff, made no record of his medical complaints, and refused to provide treatment.  (Dkt. No. 1 ¶ 25.)

Plaintiff's medical records from Five Points show that Defendant Kuhlman saw Plaintiff on January 5, 2003.  Her note indicates that she went to his cell for his 4:00 p.m. medications and he complained about the way she distributed the medication[8].  He stated that the nurse would be getting a grievance.  He was uncooperative and argumentative.  (Bannister Aff. ¶ 7.)

On January 6, 2003, Plaintiff informed Defendant Nurse Costello that he needed treatment due to great pain in his right ear and his ongoing severe body itch.  Defendant Costello

---

[7]     The complaint refers to this defendant as Nurse Coleman.  As discussed further below, Plaintiff did not serve this defendant.  In his opposition to the motion for summary judgment, Plaintiff states that he ultimately learned through discovery that her name is actually Nurse Kuhlman.  (Dkt. No. 109 at 6 n. 2.)  I will refer to this defendant as Nurse Kuhlman.

[8]     It is not clear what medications Nurse Kuhlman was distributing, since the Affidavit of Linda Bannister establishes that "nurses cannot give medications until they verify allergies and prescription orders" and that as of January 6, the day after Nurse Kuhlman saw Plaintiff,  this verification had not been completed.  (Bannister Aff. ¶ 8.)

refused to examine Plaintiff's right ear, made no record of his medical complaint, and refused to promptly provide medical treatment. (Dkt. No. 1 ¶ 26.)

Plaintiff's medical records from Five Points show that Defendant Costello saw him on January 6, 2003. She noted that he was complaining that he needed an emergency prescription for severe headache and severe itching. She noted that he requested a prompt examination by a physician. She instructed him that she would have to find the chart or the transfer paperwork because nurses cannot give medications until they verify allergies and prescription orders. (Bannister Aff. ¶ 8.)

Plaintiff's medical records from Five Points show that he was seen again the next day by Defendant Costello. Plaintiff's chart was still not available, and he again requested a prescription for itching, Hepatitis C, and a physical exam. Defendant Costello again noted that she would have to verify his requests and then possibly schedule an appointment. (Bannister Aff. ¶ 9.)

Plaintiff's medical records from Five Points show that he was seen later that day by non-defendant Nurse Gardner at the request of security staff. Plaintiff stated "I was knocked out and beaten everywhere" and claimed that he had a lump on his head. Nurse Gardner examined him and noted no redness, bruising, or bump on head. (Bannister Aff. ¶ 10.)

Plaintiff alleges that Wright, Nephew, Desotelle, and Snyder retaliated against him for his threat to sue them by filing false misbehavior reports. (Dkt. No. 1 ¶¶ 17-18.) Defendant Correction Officer LaClair was assigned to assist Plaintiff with preparing for the subsequent disciplinary hearing. (Defs.' Ex. 14.)

According to a misbehavior report filed by Defendant LaClair, when he went to Plaintiff's cell to assist him, Plaintiff "stated . . . that [LaClair] was to get him what he wanted."

Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant La Clair "informed him the interview was over and left the area." (Defs.' Ex. 15 at 2-3.) Plaintiff alleges that Defendant LaClair "falsified [the] misbehavior report against [Plaintiff] in order to refrain" from assisting Plaintiff. (Dkt. No. 1 ¶ 35.)

On January 15, 2003, Defendant Bullis arrived at Plaintiff's cell and informed him that he would conduct the disciplinary hearing that day. He asked Plaintiff whether he wanted to attend the hearing. Plaintiff said that he did not because Defendant LaClair had not assisted him, but asked Defendant Bullis to interview Defendant LaClair and an inmate witness about the events leading to Defendant LaClair's refusal to provide assistance. Plaintiff asked Defendant Bullis not to impose a loaf diet as a punishment if he found Plaintiff guilty because the loaf diet caused Plaintiff severe abdominal pains and constipation due to his hepatitis. (Dkt. No. 1 ¶ 36.)

Defendant Bullis did not interview Defendant LaClair or the inmate witness. He found Plaintiff guilty and imposed a penalty of 21 days of the loaf diet. (Dkt. No. 1 ¶ 37.) Plaintiff alleges that Defendants Weissman and Girdich "maliciously" approved the penalty in "reckless disregard" of the pain it would inflict on Plaintiff. (Dkt. No. 1 ¶ 38.) Plaintiff alleges that "[d]ue to the danger that the . . . loaf diet posed" to his well-being, he refused to eat it. As a result, he lost 33 pounds and suffered severe abdominal pains and emotional distress that exacerbated his hepatitis. (Dkt. No. 1 ¶ 39.)

Plaintiff alleges that Defendants Brousseau, Donelli, Selsky, Girdich, and Eagen mishandled the grievances and appeals he filed or attempted to file regarding his claims. (Dkt. No. 1 ¶¶ 28-34, 40.)

Plaintiff filed this lawsuit on October 6, 2004.  The parties proceeded to discovery, which proved contentious.  Plaintiff successfully moved to compel responses to his discovery requests, and thereafter filed four motions for sanctions seeking Defendants' compliance with the order compelling discovery.  (Dkt. Nos. 56, 73, 94, 103.)  I granted each of those motions in part. (Dkt. Nos. 62, 79, 99, 107.)  As is relevant here, I ruled that because not all of the pages of the Five Points Movement and Control Log Book for November 14, 2003, had been provided to Plaintiff before the original was destroyed, Plaintiff could ask the Court to draw factual inferences favorable to him.  (Dkt. No. 99 at 2.)  I ruled that because Defendants could not locate the SHU log book for January 2003, Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing pages for January 14, 2003" in opposition to Defendants' motion for summary judgment.  (Dkt. No. 99 at 1-2.)  I noted that Defendants had told Plaintiff that photographs taken of him on January 10, 2003, would be produced but that, without explanation, Defendants could no longer find the photographs.  Accordingly, I ruled that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs.  (Dkt. No. 99 at 2-3.)  I ordered that if photographs taken of Plaintiff on January 3, 2003, no longer existed, Plaintiff could similarly request favorable inferences.  (Dkt. No. 99 at 3.)

On March 16, 2009, Plaintiff again moved for sanctions.  (Dkt. No. 103.)  I noted that the photographs from January 3 and 10, 2003, were still missing.  (Dkt. No. 107 at 1.)  I reiterated that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs.  (Dkt. No. 107 at 2.)

Currently pending before the Court is Defendants' motion for summary judgment.  (Dkt. No. 92.)  Plaintiff has opposed the motion.  (Dkt. No. 109.)

11

## II.     APPLICABLE LEGAL STANDARDS

### A.     Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."[9] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[10] In determining whether a genuine issue of material[11]

---

[9]     *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *see also* Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is properly made [by a defendant] and supported [as provided in this rule], the [plaintiff] may not rely merely on allegations . . . of the [plaintiff's] pleading . . . .").

[10]     *Ross v. McGinnis*, No. 00-CV-0275, 2004 U.S. Dist. LEXIS 9367, at * 20-21, 2004 WL 1125177, at *8 (W.D.N.Y. Mar. 29, 2004) (internal quotations omitted) (emphasis added).

[11]     A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.[12]

### B.   Legal Standard Governing Motion to Dismiss for Failure to State a Claim

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment."  *Schwartz v. Compagnise Gen. Transatlantique*, 405 F.2d 270, 273-74 (2d Cir. 1968) (citations omitted); *accord*, *Katz v. Molic*, 128 F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that . . . a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").  Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte*, address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted.[13]  For these reasons, it is appropriate to briefly summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

---

[12]      *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (citation omitted); *Thompson v. Gjivoje*, 896 F.2d 716, 720 (2d Cir. 1990) (citation omitted).

[13]      The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis*] at any time if the court determines that . . . the action . . . is frivolous or malicious[,] . . . fails to state a claim on which relief may be granted[,] . . . or . . . seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall . . . dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted . . . ."

13

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2);[14] or (2) a challenge to the legal cognizability of the claim.[15]

---

[14]     *See* 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem*, 39 B.R. 140, 143 (Bankr. S.D.N.Y. 1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello*, 55 F.R.D. 72, 74 (S.D.N.Y. 1972) ("This motion under Fed. R. Civ. P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed. R. Civ. P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.'").

[15]     *See  Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest. . . . In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon*, 360 F.3d 73, 80 (2d Cir. 2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas*, 308 F.3d 180, 187 (2d Cir. 2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation . . . fails as a matter of law.") (citation omitted); *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 379 F. Supp.2d 348, 370 (S.D.N.Y. 2005) ("Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6)].") (citation omitted); *Util. Metal Research & Generac Power Sys.,Inc.*, No. 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993, at *1-2 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a]); *accord*, *Straker v. Metro Trans. Auth.*, 333 F. Supp. 2d 91, 101-102 (E.D.N.Y. 2004); *Tangorre v. Mako's, Inc.*, No. 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12(b)(6) motion--one aimed at the sufficiency of the pleadings under Rule 8(a), and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests."[16] The main purpose of this rule is to "facilitate a proper decision on the merits."[17] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims."[18]

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the

---

[16]     *Dura Pharm., Inc. v. Broudo*, 125 S. Ct. 1627, 1634 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see also Swierkiewicz*, 534 U.S. at 512 (citation omitted); *Leathernman v. Tarrant County Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 168 (1993) (citation omitted).

[17]     *Swierkiewicz*, 534 U.S. at 514 (quoting *Conley*, 355 U.S. at 48); *see also Simmons v. Abruzzo*, 49 F.3d 83, 86 (2d Cir. 1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citations omitted).

[18]     *Gonzales v. Wing*, 167 F.R.D. 352, 355 (N.D.N.Y. 1996) (McAvoy, J.), *aff'd*, 113 F.3d 1229 (2d Cir. 1997) (unpublished table opinion); *accord*, *Hudson v. Artuz*, 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov. 30, 1998), *Flores v. Bessereau*, No. 98-CV-0293, 1998 U.S. Dist. LEXIS 8750, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J.). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See*, *e.g.*, *Photopaint Technol., LLC v. Smartlens Corp.*, 335 F.3d 152, 156 (2d Cir. 2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.*, 104 F.3d 355 (2d Cir. 1996)).

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556-57, 570 (2007)).  Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but has not *shown* - that the pleader is entitled to relief."  *Iqbal*, 129 S.Ct. at 1950 (emphasis added).

It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed. R. Civ. P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."[19]  "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se*."[20]  In other words,  while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual

---

[19]     *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994).

[20]     *Hernandez*, 18 F.3d at 136 (citation omitted); *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003) (citations omitted); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 619 (2d Cir. 1999) (citation omitted).

assertions are consistent with the allegations of the plaintiff's complaint.[21]  Moreover, "courts

must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that

they suggest."[22]  Furthermore, when addressing a *pro se* complaint, *generally* a district court

"should not dismiss without granting leave to amend at least once when a liberal reading of the

complaint gives any indication that a valid claim might be stated."[23]  Of course, an opportunity to

amend is not required where the plaintiff has already amended his complaint.[24]  In addition, an

---

[21]      "Generally, a court may not look outside the pleadings when reviewing a Rule
12(b)(6) motion to dismiss.  However, the mandate to read the papers of *pro se* litigants
generously makes it appropriate to consider plaintiff's additional materials, such as his
opposition memorandum."  *Gadson v. Goord,* No. 96-CV-7544, U.S. Dist. LEXIS 18131 1997
WL 714878, at *1, n. 2, 1997 (S.D.N.Y. Nov. 17, 1997) (citing, *inter alia*, *Gil v. Mooney*, 824
F.2d 192, 195 [2d Cir. 1987] [considering plaintiff's response affidavit on motion to dismiss]).
Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is
appropriate for the court to consider materials outside the complaint to the extent they 'are
consistent with the allegations in the complaint.'" *Donhauser v. Goord*, 314 F. Supp.2d 119, 212
(N.D.N.Y. 2004) (considering factual allegations contained in plaintiff's opposition papers)
(citations omitted), *vacated in part on other grounds*, 317 F. Supp.2d 160 (N.D.N.Y. 2004).  This
authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil
Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any
time before the service of a responsive pleading–which a motion to dismiss is not.  *See
Washington v. James*, 782 F.2d 1134, 1138-39 (2d Cir. 1986) (considering subsequent affidavit
as amending *pro se* complaint, on motion to dismiss) (citations omitted).

[22]      *Cruz v. Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (finding that plaintiff's
conclusory allegations of a due process violation were insufficient) (internal quotation and
citation omitted).

[23]      *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (internal quotation and
citation omitted); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when
justice so requires").

[24]      *Yang v. New York City Trans. Auth.*, No. 01-CV-3933, 2002 U.S. Dist. LEXIS
20223, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where
plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec ., Inc.*,
16 F. Supp. 2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already
amended complaint once).

opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it."[25]

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed),[26] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and

---

[25]    *Cuoco*, 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted);  *see, e.g., See Rhodes v. Hoy*, No. 05-CV-0836, 2007 U.S. Dist. LEXIS 48370, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint–the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process–was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell*, No. 07-CV-0166, 2008 U.S. Dist. LEXIS 62919, 2008 WL 3582743, at *2 (D. Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint–lack of subject-matter jurisdiction and lack of standing–were substantive and not formal in nature, rendering repleading futile) (citations omitted); *Hylton v. All Island Cab Co.*, No. 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint–which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence–were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba*, No. 00-CV-1309, 2001 U.S. Dist. LEXIS 737, 2001 WL 58834, at *11 (D. Conn. Jan. 23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint–the fact that the defendants were protected from liability by Eleventh Amendment immunity–was substantive and not formal in nature, rendering repleading futile).

[26]    *Sealed Plaintiff v. Sealed Defendant # 1*, No. 06-1590, 2008 U.S. App. LEXIS 17113, 2008 WL 3294864, at *5 (2d Cir. Aug. 12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training . . . should not be impaired by harsh application of technical rules.") (citation omitted).

12.[27]  Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the

requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights

plaintiffs must follow.[28]  Stated more plainly, when a plaintiff is proceeding *pro se*, "all normal

rules of pleading are not absolutely suspended."[29]

## III.    ANALYSIS

### A.    Weissman/Richards Health Care

Plaintiff alleges that Defendant Drs. Weissman and Richards violated his Eighth

Amendment right to adequate medical care by prescribing an ineffective medication for his body

itch, refusing to order an MRI of his left wrist and right ankle, and refusing to refer him to an

orthopedist.  (Dkt. No. 1 ¶ 12.)  Defendants move for summary judgment of these claims, arguing

---

[27]       *See Prezzi v. Schelter*, 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner*, 404 U.S. 519 (1972), did not save *pro se* complaint from dismissal for failing to comply with Fed. R. Civ. P. 8); *accord*, *Shoemaker v. State of Cal.*, 101 F.3d 108 (2d Cir. 1996) (citing *Prezzi v. Schelter*, 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter*, 469 F.2d 691, within the Second Circuit); *accord*, *Praseuth v. Werbe*, 99 F.3d 402 (2d Cir. 1995).

[28]       *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed . . .  we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California*, 422 U.S. 806, 834, n.46 (1975) ("The right of self-representation is not a license . . . not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 477 (2d Cir. 2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *cf. Phillips v. Girdich*, 408 F.3d 124, 128, 130 (2d Cir. 2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading []or prejudice the adverse party").

[29]       *Stinson v. Sheriff's Dep't of Sullivan County*., 499 F. Supp. 259, 262 & n.9 (S.D.N.Y. 1980).

that (1) Plaintiff did not suffer from a serious medical need; and (2) Defendants were not deliberately indifferent.  (Dkt. No. 92-10 at 13-14.)

      1.    Eighth Amendment Standard

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments.  The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment.  *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976).  Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Estelle*, 429 U.S. at 102.  Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners.  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Thus, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component.  *Farmer*, 511 U.S. at 834.  To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.'"  *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).  Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries.  "The first inquiry is whether the prisoner was actually deprived of adequate medical care."  *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006).  The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire.  Rather, prison officials fulfill their obligations under the

Eighth Amendment when the care provided is 'reasonable.'" *Jones v. Westchester County Dept. of Corr. Med. Dept.*, 557 F. Supp. 2d 408, 413 (S.D.N.Y. 2008).

The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin*, 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. *Id*. If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." *Id*. A "serious medical need" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990) (Pratt, J. dissenting) (citations omitted), *accord*, *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1996), *cert. denied*, 513 U.S. 1154 (1995); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance*, 143 F.3d at 702-03.

If the claim is that treatment was provided that was inadequate, the second inquiry is narrower. *Salahuddin*, 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment

21

rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003).

To satisfy the subjective component of an Eighth Amendment medical care claim, the defendant's behavior must be "wanton." What is considered "wanton" must be determined with "due regard for differences in the kind of conduct against which an Eighth Amendment objection is raised." *Whitley v. Albers*, 475 U.S. 312, 320 (1986). Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle*, 429 U.S. at 105; *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act . . . that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Chance*, 143 F.3d at 703 (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835; *Ross v. Giambruno*, 112 F.3d 505, at *2 (2d Cir. 1997). An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105-06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim . . . under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a

22

constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.").  However, malpractice that amounts to culpable recklessness constitutes deliberate indifference.  Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance*, 143 F.3d at 703 (citation omitted).  Medical decisions that are contrary to accepted medical standards may constitute deliberate indifference if "the doctor has based his judgment on something other than sound medical judgment." *Stevens v. Goord*, 535 F. Supp. 2d 373, 385 (S.D.N.Y. 2008)(citation omitted).  For instance, a doctor may be deliberately indifferent if he opts for an easier and less efficacious treatment plan "not on the basis of [his or her] medical views, but because of monetary incentives." *Chance*, 143 F.3d at 704.

    2.    <u>Atarax</u>

Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to prescribe Atarax.  (Dkt. No. 1 ¶¶ 1, 12.)  Defendants move for summary judgment, arguing that Plaintiff's claim regarding the Atarax medication fulfills neither the objective nor the subjective prong of a viable Eighth Amendment claim.  (Dkt. No. 92-10 at 13-14.)

Regarding the objective prong, the parties' briefs focus entirely on whether Plaintiff suffered from a serious medical need.[30]  Applying the analytical framework described above, I

---

[30]    Defendants argue that Plaintiff's severe body itch was not a serious medical need because it was not a "condition of urgency, one that may produce death, degeneration, or extreme pain".  (Dkt. No. 92-10 at 13.)  Plaintiff argues that severe body itch was a symptom of his

must first address whether Plaintiff was actually deprived of adequate medical care.  I find that there is a triable issue of fact that the refusal to prescribe Atarax constituted a denial of adequate or reasonable care.  I base this finding on the fact that Defendant Dr. Richards twice requested approval to prescribe Atarax, noting that he had already tried treating Plaintiff with Hydroxyzine, Vistril, Allegra, and Zytrec "all of which worsened [Plaintiff's] condition."  (Weissman Aff. Ex. A-9.)

Because Plaintiff alleges that he was provided with inadequate treatment, rather than completely deprived of treatment, the next inquiry is whether the *deprivation* was sufficiently serious.  This requires an analysis of what harm, if any, the failure to prescribe Atarax caused or will cause Plaintiff.  Here, there is simply no evidence before the Court that being deprived of Atarax harmed or threatened to harm Plaintiff.  Rather, the evidence shows that Plaintiff suffered from a severe body itch.  While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation.  Therefore, I find that Plaintiff has not raised a triable issue of fact regarding the objective prong of his Eighth Amendment claim regarding Defendant Weissman and Richards' failure to prescribe Atarax.

Having found that there is not a triable issue of fact as to the objective prong, it is not necessary to analyze the subjective prong.  However, I will briefly address the parties' contentions for the sake of completeness.  Defendants argue that the refusal by Defendants Weissman and Richards to prescribe Atarax was not deliberate indifference because the decision of "which medicine to prescribe for a particular condition amount[s] to nothing more than a disagreement with the course of treatment - not deliberate indifference."  (Dkt. No. 92-10 at 13-

---

Hepatitis C, which is a serious medical need.  (Dkt. No. 109 at 28-30.)

14.)  Defendants' argument regarding deliberate indifference is based entirely on the affidavit of

Dr. Weissman.[31]  Interestingly, in contrast to her statements regarding Plaintiff's orthopedic care

(discussed below), Dr. Weissman does *not* state that the decision not to prescribe Atarax was

based on her medical judgment.  Rather, she states that Atarax is a "non-formulary" medication

and  "special approval must be obtained to issue that medication."  (Weissman Aff. ¶ 4.)  Dr.

Weissman does not say who was authorized to approve the use of non-formulary drugs.  Dr.

Richards twice requested approval to prescribe Atarax to Plaintiff.  (Weissman Aff. ¶¶ 7-8, Ex.

A-9 and A-10.)  In one of these requests, he stated that the other medications he had tried

"worsened" Plaintiff's condition.  (Weissman Aff. Ex. A-9.)  His requests were denied.

(Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.)  This sequence of events raises two interesting and

related issues: does the acquiescence of Dr. Weissman and Dr. Richards to a course of treatment

for Plaintiff with which they disagreed constitute deliberate indifference?[32]  Or does the fact that

the decision not to prescribe Atarax was made by someone other than Dr. Weissman and Dr.

Richards indicate that they were not personally involved with, and thus not liable for, the

decision?  *See Johnson v. Wright*, 412 F.3d 398 (2d Cir. 2005) (claims against administrators

who refused to approve treatment requested by treating physicians survived summary judgment;

treating physicians were not named as defendants).  The parties have not addressed these issues,

and, due to my finding that there is no triable issue of fact as to the objective prong and in the

---

[31]     Dr. Richards did not file an affidavit supporting Defendants' motion for summary
judgment.

[32]     *See Sulton v. Wright*, 265 F. Supp. 2d 292 (S.D.N.Y. 2003) (holding that a
prisoner stated an Eighth Amendment claim against a doctor and physician's assistant who
pursued less vigorous treatment than they had originally recommended when their request for
approval of knee surgery was denied).

absence of briefing, I decline to do so.

      3.    <u>MRI and Orthopedic Referral</u>

      Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to take MRIs of his left wrist and right ankle or to refer him to an orthopedist who could determine if medical footwear was necessary to correct his right foot problem.  (Dkt. No. 1 ¶ 12.)  Defendants argue that (1) any deprivation was not sufficiently serious to trigger Eighth Amendment scrutiny; and (2) they were not deliberately indifferent.  (Dkt. No. 92-10 at 13-14.)  Defendants are correct.

      Even if one assumes that the deprivation was sufficiently serious to trigger Eighth Amendment scrutiny, the evidence does not raise a triable issue of fact that Defendants were deliberately indifferent.  Regarding the MRIs, Dr. Weissman declares that "Dr. Richards and I felt, in our medical judgment, an MRI was not warranted."  Because Plaintiff's "pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003."  (Weissman Aff. ¶ 11.)  In September 2003, Dr. Richards referred Plaintiff to an orthopedist for treatment of his left wrist because, after completing physical therapy, Plaintiff was "still having [a] considerable amount of pain."  (Weissman Aff. Ex. A-13.)  The orthopedist examined Plaintiff and reported that Plaintiff "seems to be improving at this point and unfortunately, there is not much else I can suggest for Henry to improve or accelerate his healing."  (Weissman Aff. Ex. A-14.)

      Plaintiff filed a grievance a year after seeing the orthopedist complaining that Dr. Richards and Dr. Weissman "willfully refused to examine my injuries, to provide medical treatment for said injuries, and to order an MRI test of said injuries conducted . . . in an attempt

to prevent me from proving the precise nature and extent of my injuries in a court of law and, thus, to dissuade me from suing." (P.'s Decl. in Opp'n to Aff. of Evelyn Weissman, Ex. D.) Plaintiff argues that this grievance proves that he "continued to complain to these defendants about continuing severe pain in his left wrist and right ankle for more than one year after he had been evaluated by the orthopedist." (Dkt. No. 109 at 24-25.) The grievance Plaintiff cites does not mention any "continuing severe pain in his left wrist and right ankle." Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment claims against Defendants Weissman and Richards.[33]

### B.    Ham/Grievances

Plaintiff alleges that Defendant Ham violated his Eighth Amendment rights by refusing to loosen or remove his restraints on November 7 and 14, 2002. (Dkt. No. 1 ¶¶ 9-10.) He further alleges that Defendants Brousseau and Donelli violated his constitutional rights by refusing to forward his grievance regarding Defendant Ham for an investigation. (Dkt. No. 1 ¶¶ 28-29.) Defendants argue that (1) Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham; (2) Plaintiff's allegations are not "sufficiently serious" to implicate the Eighth Amendment; and (3) Plaintiff's allegations regarding the handling of his grievance do not raise a constitutional claim. (Dkt. No. 92-10 at 21-23, 38.)

---

[33]    Plaintiff's complaint also asserts a retaliation claim against Defendants Weissman and Richards on these facts. (Dkt. No. 1 ¶ 12.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B) because the evidence does not establish that Defendants took adverse action. While the denial of medical care may establish adverse action, *see e.g. Odom v. Poirier*, No. 99 Civ. 4933, 2004 WL 2884409, at * 4 (S.D.N.Y. Dec. 10, 2004), I have found that Defendants Weissman and Richards did not deny Plaintiff medical care. Therefore, I recommend that the Court dismiss this claim.

1.    <u>Exhaustion of Administrative Remedies</u>

Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham.  (Dkt. No. 92-10 at 21-23.)  I find that there is a triable issue of fact that Plaintiff's failure to receive a final decision on the merits of his grievance regarding Defendant Ham was justified.

The Prison Litigation Reform Act ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under §1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."[34]  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."[35]  The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[36]

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances.[37]  First, an inmate must file a complaint with the facility's IGP clerk within twenty-one (21) calendar days of the alleged occurrence.  If a grievance complaint form is not readily available, a complaint may be submitted on plain paper.  A

---

[34]    42 U.S.C. § 1997e.

[35]    *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

[36]    7 N.Y.C.R.R. § 701.7.

[37]    7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7; *see also White v. The State of New York*, No. 00-CV-3434, 2002 WL 31235713, at *2 (S.D.N.Y. Oct. 3, 2002).

representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen (16) calendar days from receipt of the grievance to informally resolve the issue.  If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen (16) calendar days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing.  Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven (7) calendar days of receipt of the IGRC's written decision.  The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the grievant's appeal.  Third, a grievant may appeal to the central office review committee ("CORC") within seven (7) working days of receipt of the superintendent's written decision.  CORC is to render a written decision within thirty (30) calendar days of receipt of the appeal.  It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.[38]  If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative

---

[38]     7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Hemphill v. New York*, 198 F. Supp. 2d 546, 549 (S.D.N.Y. 2002), *vacated and remanded on other grounds*, 380 F.3d 680 (2d Cir. 2004); *see, e.g., Croswell v. McCoy*, 01-CV-0547, 2003 U.S. Dist. LEXIS 3442, at *12, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); *Reyes v. Punzal,* 206 F. Supp.2d 431, 433 (W.D.N.Y. 2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); *Nimmons v. Silver*, 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), *adopted by* Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

remedies. *Woodford v. Ngo*, 548 U.S. 81 (2006).

Here, Plaintiff declares that on the day of the first incident with Defendant Ham, he asked a Five Points Correctional Facility officer for a grievance form. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 17.) The officer did not give Plaintiff a form and told Plaintiff that he would need to file his grievance at Elmira Correctional Facility, where the incident had occurred. *Id.* Although an April 16, 2004, revision to the inmate grievance procedure specified that grievances "may only be filed at the facility where the inmate is housed even if it pertains to another facility," (*Id.*, at Ex. A), the procedures in effect at the time Plaintiff asked for a form to file a complaint against Defendant Ham were silent as to which facility should handle a particular grievance. Even if one assumes that the Five Points officer's advice was correct under DOCS practice at the time, it is difficult to see how Plaintiff could have filed a grievance at Elmira. Plaintiff was only at Elmira Correctional Facility for a few hours after receiving these instructions from the officer, during which time he was handcuffed and shackled. (Dkt. No. 1 ¶ 10.)

On December 8, 2002, Plaintiff filed a grievance at Upstate Correctional Facility regarding Defendant Ham's actions. (Dkt. No. 92-4, Ex. 4.) Defendant Brousseau, the IGP supervisor, returned the grievance to Plaintiff because Plaintiff failed to submit it within fourteen days of the incident.[39] *Id.*

On December 18, 2002, Plaintiff submitted a grievance complaining that Defendant Brousseau's refusal to accept the previous grievance violated his constitutional right of access to

---

[39]     The inmate grievance procedures in place at the time of the incident required inmates to file grievances within 14, rather than 21, days.

the courts because it prevented him from exhausting his claims against Defendant Ham.  (Dkt.

No. 92-4, Ex. 4.)  The IGRC denied Plaintiff's grievance on December 26, 2002.  *Id.*  The IGRC

stated that Defendant Brousseau's refusal was proper because Plaintiff "did not present any

mitigating circumstances that would warrant accepting the [untimely] complaint . . . [Plaintiff]

had been back at the facility since 11/15/02 and had filed one grievance during this time period,

this shows he had ample opportunity to file this complaint in a timely manner."  *Id.*  The

grievance to which the IGRC's decision referred was a grievance regarding Defendant Richards'

denial of Atarax.  (Dkt. No. 92-4, Ex. 3.)  Because that event occurred at Upstate Correctional

Facility, there was no ambiguity about where Plaintiff's grievance should be filed.

Plaintiff appealed the IGRC's determination to the Superintendent.  (Dkt. No. 92-4, Ex.

4.)  Defendant Donelli affirmed the IGRC's determination on January 15, 2003.  *Id.*

Defendants assert that Plaintiff "did not appeal [Defendant Donelli's decision] to the

CORC."  (Dkt. No. 92-3, Stmt. Pursuant to Rule 7.1(a)(3) ¶8.)  For this proposition, they cite

Exhibit 4 and to the Affidavit of Karen Bellamy.  *Id.*  Exhibit 4 shows that Plaintiff signed an

"Appeal Statement" stating that he wished to appeal Defendant Donelli's decision to CORC.

(Dkt. No. 92-4, Ex. 4.)  The Appeal Statement was signed by a grievance clerk.  *Id.*  That exhibit

also shows that Defendant Brousseau responded to an inquiry regarding the status of the

grievance by stating that the grievance had been received by CORC and was being processed.  *Id.*

However, the record before the Court does include any final disposition from CORC of

Plaintiff's appeal.  The appeal does not appear in a list provided in the Affidavit of Karen

Bellamy of grievances on which Plaintiff received a final decision from CORC.  (Bellamy Aff.

Ex. B.)  Thus, Plaintiff never received a decision from CORC and did not exhaust his

administrative remedies.  *See Mendez v. Artuz*, No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, at * 4, 2002 WL 313796, at * 2 (S.D.N.Y. Feb. 27, 2002).  Even if CORC had acted on Plaintiff's appeal, I assume that CORC would have upheld the IGRC's finding and denied Plaintiff's grievance as untimely.  In that event, I would find that Plaintiff had not exhausted his administrative remedies because "courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies." *Soto v. Belcher*, 339 F. Supp. 2d 592, 595 (S.D.N.Y. 2004).

Plaintiff's failure to exhaust, however, does not end the inquiry.  The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his administrative remedies.[40]  First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner."[41]  Second, if those remedies were available, "the court should . . . inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it . . . or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense."[42]  Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special

---

[40]     *See Hemphill v. State of New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004).  The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford*.  *Chavis v. Goord*, No. 07-4787-pr, 2009 U.S. App. LEXIS 13681, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

[41]     *Hemphill*, 380 F.3d at 686 (citation omitted).

[42]     *Id.* (citations omitted).

circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements."[43]  Justification "must be determined by looking at the circumstances which might understandably lead . . . uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Good*, 380 F.3d 670, 678 (2d Cir. 2004).  Here, the silence of the regulations regarding which facility was the proper venue for Plaintiff's grievance, the bad advice that Plaintiff received from the officer at Five Points, and Plaintiff's inability to follow that advice because he was shackled during his entire tenure at Elmira create a triable issue of fact that Plaintiff's failure to file a timely grievance regarding Defendant Ham's actions was justified.  I therefore find that summary judgment is not appropriate on the grounds that Plaintiff failed to exhaust his administrative remedies.

2.      "Sufficiently Serious"

Defendants argue that there is not a triable issue of material fact regarding Plaintiff's Eighth Amendment claim against Defendant Ham because "Plaintiff's alleged 'enormous pain' is nothing more than *de minimis* for Constitutional purposes."  (Dkt. No. 92-10 at 22-23.)

Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force.  *See Davidson v. Flynn*, 32 F.3d 27 (2d Cir. 1994).  When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992).  The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary

---

[43]        *Id*. (citations and internal quotations omitted).

in a particular situation or instead evinced such wantoness with respect to the unjustified

infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7 (citation and

quotation marks omitted).

> In determining whether the use of force was wanton and unnecessary,
> it may also be proper to evaluate the need for application of force, the
> relationship between that need and the amount of force used, the
> threat reasonably perceived by responsible officials, and any efforts
> made to temper the severity of a forceful response.  The absence of
> serious injury is therefore relevant to the Eighth Amendment inquiry,
> but does not end it.

*Id.* (citation and quotation marks omitted).  In other words, not "every malevolent touch by a

prison guard gives rise to a federal cause of action.  The Eighth Amendment's prohibition of

cruel and usual punishments necessarily excludes from constitutional recognition *de minimis*

uses of physical force, provided that the use of force is not of a sort repugnant to the conscience

of mankind." *Id.* at 9 (officers who punched and kicked handcuffed and shackled inmate used

unconstitutional force although inmate required no medical attention)(citations omitted);

*Davidson*, 32 F.3d at 30 n.1 (officers who placed handcuffs too tightly on inmate in retaliation

for filing lawsuits used unconstitutional force where inmate suffered permanent scarring and

numbness); *compare Warren v. Purcell*, No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, at *24,

2004 WL 1970642 (S.D.N.Y. Sept. 3, 2004) (officers who placed prisoner in tight restraints did

not violate constitution where prisoner suffered temporary pain, numbness and swelling and no

improper or wanton motive was suggested for the officers' actions).[44]

      Plaintiff does not allege that he was permanently injured as a result of Defendant Ham's

---

[44]    Defendants served this unpublished case on Plaintiff with their moving papers as
required by Local Rule 7.1(a)(1).  (Dkt. No. 92-11.)

actions.  Plaintiff states that he suffered "enormous pain" and "severe swelling" as a result of

being shackled so tightly.  (Dkt. No. 109 at 38.)  Although this would not end the Eighth

Amendment inquiry if Defendant Ham's actions had been more egregious, there is simply no

evidence in the record that Defendant Ham applied restraints to Plaintiff "maliciously and

sadistically to cause harm" or in a way that was "repugnant to the conscience of mankind."

Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's claims

against Defendant Ham.

     3.    <u>Grievances</u>

     Plaintiff alleges that Defendants Brousseau and Donelli  "refused to forward" his

complaint regarding Defendant Ham's actions "for an investigation" (Dkt. No. 1 ¶¶ 28-29), thus

violating his First Amendment right to petition the government.  (Dkt. No. 109 at 50-51.)

Defendants argue that Plaintiff's allegation fails to state a constitutional violation.  (Dkt. No. 92-

10 at 38.)  Defendants are correct.

> The First Amendment protects a prisoner's right to meaningful access
> to the courts and to petition the government for the redress of
> grievances.  *See Bill Johnson's Rest., Inc. v. NLRB*, 461 U.S. 731,
> 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983).  However, inmate
> grievance programs created by state law are not required by the
> Constitution and consequently allegations that prison officials
> violated those procedures does not give rise to a cognizable § 1983
> claim.  *Cancel v. Goord*, No. 00 Civ.2042, 2001 WL 303713, *3
> (S.D.N.Y. Mar. 29, 2001).  If prison officials ignore a grievance that
> raises constitutional claims, an inmate can directly petition the
> government for redress of that claim.  *See Flick v. Alba*, 932 F.2d
> 728, 729 (8th Cir. 1991).  "Therefore, the refusal to process an
> inmate's grievance or failure to see to it that grievances are properly
> processed does not create a claim under § 1983."  *Cancel*, 2001 WL
> 303713, at *3; *see also Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342
> (S.D.N.Y.2003); *Mahotep v. DeLuca*, 3 F. Supp. 2d 385, 390
> (W.D.N.Y. 1998).

*Shell v. Brzezniak,* 365 F. Supp. 2d 362, 369 -370 (W.D.N.Y. 2005). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham.

### C.   Frisk Room Incident/Aftermath/Grievances

Plaintiff alleges that he threatened to sue Defendants Nephew, Desotelle, and Snyder if they used force to put on his coat. (Dkt. No. 1 ¶ 15.) Plaintiff alleges that, in retaliation for this threat, (1) Defendant Wright conspired with Defendant Snyder to subject Plaintiff to excessive force; (2) Defendants Duprat, Snyder, and Bogett used excessive force on Plaintiff; (3) Defendants Wright, Nephew, Desotelle, and Snyder falsified misbehavior reports against Plaintiff; and (4) Defendant Bezio failed to intervene to prevent the use of excessive force.[45] (Dkt. No. 1 ¶¶ 16-22.) He further alleges that Defendants Brousseau and Donelli would not allow Plaintiff to file a grievance regarding these events. (Dkt. No. 1 ¶¶ 30-31.) Finally, he alleges that Defendants Girdich and Eagen denied the grievance he filed regarding Defendant Brousseau and Donelli's refusal to process Plaintiff's grievance. (Dkt. No. 1 ¶¶ 32-34.)

### 1.   Exhaustion of Administrative Remedies

Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding any of these claims. (Dkt. No. 92-10 at 25-26, 31.) Plaintiff declares that on January 13, 2003,

---

[45]   The complaint contains some language that could, very liberally construed, assert a claim against these Defendants for denial of Plaintiff's right of access to the courts on the theory that, at the time of these events, Plaintiff was being transported for a court appearance. Defendants addressed this possible claim in their motion for summary judgment. (Dkt. No. 92-10 at 40-42.) In his opposition to the motion, Plaintiff states that he did not intend to assert a claim for denial of access to the courts. (Dkt. No. 109 at 55.) I have therefore not addressed Defendants' arguments.

he attempted to submit a grievance to Defendant Brousseau regarding the claims.  (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 26.)  Plaintiff declares that Defendant Brousseau "refused to file and process the grievance . . . in order to prevent me from suing the officials named in the grievance."  *Id.* ¶ 27.

On April 3, 2003, Plaintiff submitted a grievance complaining that Defendant Brousseau had refused to accept his January 13 grievance.  (Dkt. No. 92-4, Ex. 8.)  Plaintiff requested "[t]hat Ms. Brousseau submit the grievance complaint in question to the IGRC.  Alternatively, that I be allowed to resubmit a copy of the grievance complaint in issue to the IGRC before moving for judicial intervention."  *Id.*  CORC denied the grievance on May 28, 2003, stating that it had "not been presented with sufficient evidence to substantiate any malfeasance" by Defendant Brousseau.  *Id.*

As discussed above, Second Circuit precedent holds that a defendant may be equitably estopped from raising the exhaustion defense if he or she engaged in conduct that hindered the plaintiff's ability to pursue his or her administrative remedies.  *Ziemba v. Wezner*, 366 F.3d 161, 163-64 (2d Cir. 2004).  A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies.  *Sandlin v. Poole*, 575 F. Supp. 2d 484, 488 (W.D.N.Y. 2008).  Thus, Plaintiff's declaration that Defendant Brousseau refused to accept his grievance raises a triable issue of fact that Defendants are estopped from asserting the exhaustion defense.  Therefore, I recommend that the Court reject Defendants' argument that they are entitled to summary judgment as a result of Plaintiff's failure to exhaust his administrative remedies.

2.      Conspiracy

Defendants move for summary judgment of Plaintiff's conspiracy claim.[46]  They argue

that (a) Plaintiff has not shown that there was any meeting of the minds; and (b) the claim is

barred by the intracorporate conspiracy doctrine.[47]  (Dkt. No. 92-10 at 31-32.)

a.      *Meeting of the Minds*

Defendants argue that Plaintiff has not provided any factual basis for a finding that

Defendants had a "meeting of the minds" as required for a conspiracy claim.  (Dkt. No. 92-10 at

31-32.)  I find that Plaintiff has raised a triable issue of fact.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or

more state actors or between a state actor and a private entity; (2) to act in concert to inflict an

unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."

*Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999) (citations omitted).

Plaintiff has raised a genuine issue of material fact as to all of the elements of his § 1983

conspiracy claim.  Plaintiff states in his verified complaint that Defendant Wright told him that

"'[t]ransportation vans don't have cameras.  You're going to learn not to spit . . . [at] staff and

not threaten us with lawsuits.'"  (Dkt. No. 1 ¶ 16.)  The next day, Defendant Duprat called

---

[46]      Defendants characterize Defendants Wright and Snyder as the only defendants to
the conspiracy claim.  Read broadly, the complaint also alleges that Defendant Duprat conspired
with Defendants Wright and Snyder by calling Snyder "to arrange a beating" of Plaintiff.  (Dkt.
No. 1 ¶ 21.)  I will include Defendant Duprat in my analysis of Plaintiff's conspiracy claim.

[47]      Defendants also argue that to the extent Plaintiff's conspiracy claim is brought
under 42 U.S.C. § 1985, he has not shown that Defendants were motivated by any class-based
animus.  (Dkt. No. 92-10 at 31-32.)  In his opposition to Defendants' motion, Plaintiff states that
he did not intend to raise a claim under 42 U.S.C. § 1985.  (Dkt. No. 109 at 44 n.15.)  Therefore,
I have not addressed Defendants' argument regarding class-based animus.

Defendant Snyder "to arrange a beating" of Plaintiff.  (Dkt. No. 1 ¶ 21.)  Defendant Snyder

entered the transportation van in which Plaintiff was sitting, said "Wright, my boss, doesn't like

[you suing us] and sent this as a reminder," and then punched and slapped Plaintiff until Plaintiff

lost consciousness.  (Dkt. No. 1 ¶¶ 21-22.)  A reasonable jury could, if it found Plaintiff's

testimony credible, return a verdict for Plaintiff on his conspiracy claim based on this evidence.

      b.    *Intracorporate Conspiracy Doctrine*

      Defendants argue that Plaintiff's conspiracy claim is barred by the intracorporate

conspiracy doctrine.  (Dkt. No. 92-10 at 32.)  Under that doctrine, employees of a single

corporate entity are legally incapable of conspiring together.  *Bond v. Board of Educ. of City of*

*New York*, 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, at *5, 1999 WL 151702, at *2 (W.D.N.Y.

Mar. 17, 1999).  "This doctrine applies to public entities and their employees."  *Lee v. City of*

*Syracuse*, 603 F. Supp. 2d 417, 442 (N.D.N.Y. 2009) (citations omitted).  Although the Second

Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, *see Herrmann v. Moore*,

576 F.2d 453, 459 (2d Cir. 1978); *Girard v. 94th and Fifth Avenue Corp.*, 530 F.2d 66, 72 (2d

Cir. 1976), it has not extended its application of the doctrine to conspiracy claims under § 1983.

Several district courts in the Second Circuit have, however, applied the doctrine to § 1983

cases.[48]  The district court cases cited in the footnote applied the intracorporate conspiracy

---

[48]     *See Green v. Greene*, No. 9:07-CV-0351 (GTS/DEP), 2009 U.S. Dist. LEXIS 68186, 2009 WL 2424353 (N.D.N.Y. Aug. 5, 2009); *Sebast v. Mahan*, No. 09-cv-98 (GLS/RFT), 2009 U.S. Dist. LEXIS 64712, 2009 WL 2256949, at *3 (N.D.N.Y. July 28, 2009); *Lee v. City of Syracuse*, 603 F. Supp. 2d 417 (N.D.N.Y. 2009); *Lukowski v. County of Seneca*, No. 08-CV-6098, 2009 U.S. Dist. LEXIS 14282, 2009 WL 467075 (W.D.N.Y. Feb. 24, 2009); *Perrin v. Canandaigua City School Dist.*, No. 08-CV-61536, 2008 U.S. Dist. LEXIS 95280, 2008 WL 5054241 (W.D.N.Y. Nov. 21, 2008); *Rodriguez v. City of New York*, ___ F. Supp. 2d ___, No. 05-CV-5117, 2008 U.S. Dist. LEXIS 9966, 2008 WL 420015 (E.D.N.Y. Feb. 11, 2008); *Crews v. County of Nassau*, No. 06-CV-2610, 2009 U.S. Dist. LEXIS 38354, 2007 WL 4591325

doctrine to § 1983 without discussing whether it was appropriate to do so.  In *Anemone v. Metropolitan Transportation Authority*, 419 F. Supp. 2d 602, 604 (S.D.N.Y. 2006), the Southern District squarely held that the intracorporate conspiracy doctrine should be applied to § 1983 cases because "the doctrine's logic is sound" and not "a single case within the Second Circuit [has] held the doctrine inapplicable to Section 1983 claims."  I will assume that the doctrine applies in § 1983 cases.

Even where the intracorporate conspiracy doctrine applies, there is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord*, 411 F. Supp. 2d 153, 165 (N.D.N.Y. 2006) (citation and quotation marks omitted), *vacated and remanded on other grounds*, *Orafan v. Rashid*, No. 06-2951, 249 Fed. Appx. 217 (2d Cir. Sept. 28, 2007).   I have previously found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit.  *Medina v. Hunt*, No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept. 25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force.  *Hill v. City of New York*, No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at *6 (E.D.N.Y. Dec. 30, 2005).  I find that the exception applies here because, as in

---

(E.D.N.Y. Dec. 27, 2007); *Little v. City of New York*, 487 F. Supp. 2d 426 (S.D.N.Y. 2007); *Clark v. City of Oswego*, No. 5:03-CV-202 (NAM/DEP), 2006 U.S. Dist. LEXIS 95769, 2007 WL 925724 (N.D.N.Y. March 26, 2007); *Malone v. City of New York*, No. CV-05-2882, 2006 U.S. Dist. LEXIS 61866, 2006 WL 2524197 (E.D.N.Y. Aug. 30, 2006); *Caidor v. M&T Bank*, No. 5:05-CV-297 (FJS/GJD), 2006 U.S. Dist. LEXIS 22980, 2006 WL 839547 (N.D.N.Y. Mar. 27, 2006).

*Medina*, Defendants allegedly conspired to retaliate against Plaintiff for his exercise of his right

to access the courts.  Therefore, I recommend that the Court deny Defendants' motion for

summary judgment of the conspiracy claim against Defendants Wright, Snyder, and Duprat.

　　　3.　　Excessive Force

　　　Defendants move for summary judgment of Plaintiff's excessive force claims.  They

argue that there is no "objective evidence" that any excessive force was used.  (Dkt. No. 92-10 at

33-35.)  Specifically, Defendants argue that:

> [P]laintiff alleges that . . . [D]efendants Snyder, Bogett, and Duprat
> punched him, slapped him, knocked him unconscious, and caused his
> ear to bleed.  There is no objective evidence to support this
> conclusory allegation.  An unusual incident report was generated
> because of [P]laintiff's behavior on January 3, 2003, but the report
> specifically states that no force was used on [P]laintiff.  To the extent
> [P]laintiff is claiming the alleged force was used in the van, after the
> incidents described in the unusual incident report, there is no
> objective evidence to support this conclusion either.  Plaintiff's
> medical records for January 3, 2003, upon arrival at Five Points C.F.
> indicate "arrived via van with cuffs & chains and spit net - complains
> of pain and itching," that [P]laintiff was escorted to 12 building, and
> that [P]laintiff was given Naprosyn and Benadryl.  There is no
> indication of bleeding, or that [P]laintiff reported being assaulted in
> the January 3, 2003 entry, or the entries for January 4, 5, and 6, 2003.
> Plaintiff does report being "knocked-out and beaten everywhere" on
> January 7, 2003, while still at Five Points C.F., but without any
> record of reporting this type of conduct for the four (4) days prior to
> January 7, 2003, it is not credible that the incident to which [P]laintiff
> is referring occurred on January 3, 2003.  Moreover, the January 7,
> 2003, entry does not indicate whether [P]laintiff was claiming to have
> been "knocked out and beaten everywhere" by staff or other inmates.
> Plaintiff has no objective evidence to support his claim of excessive
> force.

(*Id.* at 34-35, citations omitted.)

　　　Defendants refer to Plaintiff's allegations as "conclusory."  "Conclusory" means to

41

"express[] a factual inference without stating the underlying facts on which the inference is based." *Black's Law Dictionary* 284 (7th ed. 1999). Plaintiff's allegations are not conclusory. Rather, Plaintiff describes the incident in detail. The ultimate determination of whether or not Defendants used excessive force, then, will rest largely on the finder of fact's judgment regarding Plaintiff's credibility.

Defendants, naturally, do not find Plaintiff credible. In general, of course, "[c]redibility determinations . . . are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). *See also Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Although Defendants do not explicitly say so, their argument that "Plaintiff has no *objective* evidence" is apparently an attempt to invoke a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005); *Blake v. Race*, 487 F. Supp. 2d 187, 202 (E.D.N.Y. 2007). In *Jeffreys*, the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys*, 426 F.3d at 554.

The narrow holding of *Jeffreys* is not applicable here for three reasons. First, in order for the *Jeffreys* exception to apply, the plaintiff must rely "almost exclusively on his own testimony." *Jeffreys*, 426 F.3d at 554. Here, Plaintiff is not relying "almost exclusively on his own testimony." Rather, because of Defendants' conduct during discovery, Plaintiff is relying on his

42

own testimony plus adverse inferences drawn in his favor.  As a consequence of Defendants'
conduct during discovery, I ordered that Plaintiff could "ask the Court to draw factual inferences
favorable to him based upon the missing photographs of January 3 and 10, 2003." (Dkt. No. 107
at 2.)  Plaintiff requests that the Court draw the following inference in his favor: "That were the
Defendants to provide the Court with the missing photographs taken of [Plaintiff] at Five Points
C.F. on January 3, 2003, such photographs would reveal that [Plaintiff] had bruises and
lacerations on his face, right ear, and chest."  (Dkt. No. 109 at 46-47 n.15.)  The Court grants
Plaintiff's request and draws the inference in his favor.

Second, in order for the *Jeffreys* exception to apply, Plaintiff's testimony must be
"contradictory or incomplete." *Jeffreys*, 426 F.3d at 554.  Here, Plaintiff's testimony is neither
contradictory nor incomplete.  In *Jeffreys*, the plaintiff, who alleged that police officers had
beaten and defenestrated him, confessed on at least three occasions that he had jumped out of a
third-story window rather than having been thrown.  *Id.* at 552.  The plaintiff did not publicly
state that he had been thrown out of a window by police officers until *nine months* after the
incident.  *Id.*  The plaintiff could not identify any of the individuals whom he alleged participated
in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the
night in question.  *Id.*  Here, in contrast, Plaintiff has never given a contradictory account of the
events in the transportation van on January 3, 2003.  Although Defendants stress that Plaintiff's
medical records do not show that Plaintiff reported the incident upon arrival at Five Points,
Plaintiff states in his verified complaint that he informed Defendant Hensel on the day of the
incident that he had been beaten by Upstate guards.  He further alleges that Defendant Hensel
made no record of his complaint. (Dkt. No. 1 ¶ 23.)  Plaintiff's claim regarding Nurse Hensel is

43

corroborated by the log book entry that shows that he was taken to see Nurse Hensel on January 3, 2003, and the fact that Defendants did not provide the Court with a medical record of that visit with Plaintiff's other Five Points Medical Records.  (Defs.' Resp. to P's 1st Req. for Produc. of Docs., Ex. E at 11; Bannister Aff.)  As Defendants admit, Plaintiff's medical records show that within four days of the incident he reported that he had been "knocked-out and beaten everywhere."  (Bannister Aff. ¶ 10.)  In addition, unlike in *Jeffreys*, Plaintiff has specifically identified the officers whom he alleges beat him.

Third, the *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony.  In *Jeffreys*, for instance, one of the arresting officers declared that, contrary to the plaintiff's version of events,  he was the only officer who entered the room where the plaintiff was allegedly beaten and that he saw the plaintiff jump out the open window. *Jeffreys*, 426 F.3d at 551-52.   Here, Plaintiff's version of events has not been contradicted by an affidavit from any of the officers whom he alleges used excessive force because Defendants' motion for summary judgment is not supported by any affidavit from Defendants Snyder, Duprat, or Bogett.  The only proof offered by Defendants that they did *not* use excessive force is a notation on a January 3, 2003, unusual incident report stating "Use of Force: No."  (Dkt. No. 92-5, Ex. 16.)

Accordingly, I find that Plaintiff has presented sufficient "objective evidence" to raise a triable issue of fact that Defendants Snyder, Duprat, and Bogett subjected him to excessive force.[49]  I therefore recommend that the Court deny Defendants' motion for summary judgment

---

[49]     Read broadly, the complaint also asserts an excessive force claim against Wright and retaliation claims against Defendants Snyder, Duprat, Bogett, and Wright.  Defendants have not addressed these potential claims.  I find that the claims are sufficient to withstand *sua sponte*

of this claim.

    4.    <u>False Misbehavior Reports</u>

Plaintiff alleges that Defendants Nephew, Desotelle, Snyder, and Wright filed false misbehavior reports against him "in retaliation for his having threatened to sue them."  (Dkt. No. 1 ¶¶ 17-18.)  Defendants argue that (a) Plaintiff forfeited his claim by refusing to attend the disciplinary hearing on the charges; and (b) they would have issued the misbehavior reports regardless of any alleged retaliatory motive.  (Dkt. No. 92-10 at 25-29.)

    a.    *Forfeiture*

Defendants argue that Plaintiff "cannot establish a prima facie case of retaliation, because although he claims the misbehavior report[s were] 'falsified,' he has forfeited his opportunity to present any evidence calling into question the truth of the misbehavior report[s] by refusing to attend the disciplinary hearing."  (Dkt. No. 92-10 at 26.)  Defendants cite *Brewer v. Kamas*, 533 F. Supp. 2d 318 (W.D.N.Y. 2008).  In order to analyze *Brewer*, a review of Second Circuit precedent governing prisoners' allegations regarding false misbehavior reports is required.

A prisoner's claim that a correctional officer filed a false misbehavior report may implicate two separate constitutional provisions: (a) the Fourteenth Amendment right to procedural due process; or (b) the right not to be retaliated against for exercising First Amendment rights such as the right of access to the courts or the right to petition the government for redress of grievances.

In the procedural due process context, the Second Circuit has held that while a prisoner "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct

review under 28 U.S.C. § 1915(e)(2)(B).

which may result in the deprivation of a protected liberty interest," he *does* have "the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). Where a prisoner is falsely accused of violating disciplinary rules, and a hearing is held on the allegedly false charges that comports with the procedural due process standards set forth by the Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539 (1974), and any resulting guilty finding is based on "some evidence," the correctional officer's filing of unfounded charges does not give rise to procedural due process liability. *Freeman*, 808 F.2d at 953-54.

Two years after its *Freeman* opinion, the Second Circuit addressed the second variety of false misbehavior claim - a claim that an officer filed a false misbehavior report in retaliation for the exercise of constitutionally protected rights - in *Franco v. Kelly*, 854 F.2d 584 (2d Cir. 1988). In *Franco*, a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for his cooperation with an investigation by the state Inspector General into incidents of inmate abuse at Attica Correctional Facility. *Franco*, 854 F.2d at 586. The defendants moved for summary judgment, arguing that Plaintiff could not state a claim because he had received a disciplinary hearing that complied with *Wolff v. McDonnell* and resulted in a guilty finding based on "some evidence." *Id.* The trial court granted the defendants' motion, relying on *Freeman*. *Id.* The trial court noted, however, "that under [t]his reading of *Freeman*, the mere provision of procedural due process could eliminate all liability in any case in which prison officials had intentionally filed false and unfounded charges." *Id.* The Second Circuit settled "the substantial and troublesome questions raised in th[e] case" by holding that "[a]lthough our decision in *Freeman* accords prison officials wide latitude in disciplining

46

inmates as long as minimum constitutional procedures are employed, that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights" such as the prisoner's First Amendment rights of access to the courts and to petition for redress of grievances. *Id.* at 590 (citations omitted). Accordingly, the Second Circuit reversed the trial court's judgment and remanded the matter for further proceedings. *Id.* at 590-91.

In *Jones v. Coughlin*, 45 F.3d 677 (2d Cir. 1995), the Second Circuit again clarified that the holding in *Freeman* is doctrinally different and distinct from the type of retaliation claim discussed in *Franco*. In *Jones*, a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for filing an administrative complaint against one of their colleagues. *Jones*, 45 F.3d at 678. At his disciplinary hearing, the prisoner was denied the opportunity to call witnesses. *Id.* He was found guilty and sentenced to serve 120 days in the SHU. *Id.* After he had served his SHU sentence, DOCS official Donald Selsky reversed the decision and expunged it from the prisoner's record. *Id.* at 679. The prisoner filed suit. *Id.* The trial court granted the prison officials' motion for summary judgment, finding that the prisoner's allegations against the corrections officers failed to state a claim under *Freeman* and that the prisoner's allegations against the hearing officer failed because any procedural due process defects in the hearing had been cured by Selsky's reversal of the decision. *Id.*

On appeal, the Second Circuit stated that *Freeman* did not provide the "proper framework" for a decision in the case for both "factual and doctrinal reasons." *Jones*, 45 F.3d at 679. Factually, the case was distinguishable "if, as alleged, Jones was unfairly denied the right to call key witnesses in defense of the charges against him." *Id.* Doctrinally, the Second Circuit stated that "we have held that a prisoner has a substantive due process right not to be subjected to

47

false misconduct charges as retaliation for his exercise of a constitutional right such as

petitioning the government for redress of his grievances, and that this right is distinct from the

procedural due process claim at issue in *Freeman*." *Id.* at 679-80. The Second Circuit vacated

the trial court's judgment and remanded for further proceedings. *Id.* at 680.

This brings us to *Brewer*. In *Brewer*, a prisoner alleged that correction officers filed false

misbehavior reports against him in retaliation for filing grievances. *Brewer*, 533 F. Supp. 2d at

323. The prisoner refused to attend his disciplinary hearing and was found guilty. *Id.* He sued

the officers in federal court. *Id.* at 324. The officers moved for summary judgment. *Id.* The

court granted the motion, finding that the prisoner could not establish that the disciplinary

charges were false because (1) he refused to attend his disciplinary hearing; (2) he offered no

"explanation as to why he chose not to attend the hearing so as to rebut the charges, or why it was

otherwise constitutionally deficient"; and (3) he did not "offer . . ., in opposition to [d]efendants'

motion, any evidence calling into question the truth of the . . . charges." *Id.* at 330. (citation

omitted). Based on these three factors, the court stated that the plaintiff "was provided with the

requisite opportunity to rebut the alleged false disciplinary charges, as required by due process,

and Plaintiff, by failing to do so, has waived his right to further challenge the validity" of the

misbehavior report. *Id.* (citation omitted).

*Brewer* is not applicable here for three reasons. First, the case is factually

distinguishable. In *Brewer*, the prisoner did not offer any explanation for his refusal to attend the

hearing, did not explain why the hearing was constitutionally deficient, and did not offer any

evidence calling into question the truth of the charges. *Brewer*, 533 F. Supp. 2d at 330. Here,

Plaintiff has explained that he did not attend the hearing because Defendant LaClair refused to

assist him prepare a defense, has argued that the hearing was constitutionally deficient because Defendant Bullis did not call Defendant LaClair and an inmate as witnesses, and has offered his own testimony under penalty of perjury to rebut Defendants' version of the events leading to the misbehavior reports.

Second, Defendants overstate the holding of *Brewer*.  The court did not hold that the prisoner had forfeited his opportunity to present evidence calling into question the truth of the misbehavior report simply by refusing to attend the disciplinary hearing.  Rather, the court held that the prisoner had waived his right for three reasons, with the refusal to attend being only one of them.  *Brewer*, 533 F. Supp. 2d at 330.

Third, because the prisoner in *Brewer* asserted a retaliation claim rather than a procedural due process claim, the precedent relied upon by the *Brewer* court is puzzling.  The portion of the decision cited at length by Defendants relies on (1) *Freeman*, which is a procedural due process case; (2) language from *Jones* that discusses the ways in which *Jones* was *factually* distinguishable from *Freeman*, rather than the language in *Jones* clarifying that a retaliation claim is *doctrinally* different from the type of procedural due process claim at issue in *Freeman*; and (3) quotes from *Franco* that summarize the procedural due process holding in *Freeman*, rather than quotes from *Franco* discussing the proper analysis of a retaliation claim.  Thus, although the prisoner in *Brewer* raised a retaliation claim, the court analyzed it as a procedural due process claim.

Because I find that *Brewer* is factually distinguishable from Plaintiff's case, that the holding in *Brewer* is not as broad as Defendants suggest, and that *Brewer's* legal analysis rests on a line of cases to which the Second Circuit has referred as the improper framework for analyzing

49

a retaliation claim, I recommend that the Court reject Defendants' argument that Plaintiff waived his claim regarding the allegedly false and retaliatory misbehavior reports by failing to appear at his disciplinary hearing.[50]

      b.    *Regardless of retaliatory motive*

Defendants argue that there is "ample evidence" that Defendants "would have issued the misbehavior report[s] regardless of whether [P]laintiff threatened to sue them." (Dkt. No. 92-10 at 28, 30.)

"An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right . . . states a claim under § 1983. A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (citations and quotation marks omitted).

Here, the misbehavior reports by Defendants Nephew, Desotelle, and Snyder charged

---

[50]      I note that *Howard v. Wilkerson*, 768 F. Supp. 1002 (S.D.N.Y. 1991) holds that "[a]n inmate's refusal to attend a disciplinary hearing waives his *due process objections* . . . only when it occurs through no fault of prison officials." *Howard*, 768 F. Supp. at 1006 (citation and quotation marks omitted) (emphasis added). *Howard* is cited in *Nance v. Villafranca*, No. 91-CV-717, 1994 U.S. Dist. LEXIS 11114 (N.D.N.Y. June 20, 1994), which Defendants cite for a different proposition. (Dkt. No. 92-10 at 39.)

Plaintiff with creating a disturbance, committing an unhygenic act, refusing a direct order, and making threats.  (Dkt. No. 92-5, Ex. 11.)  As the Second Circuit explained in *Hynes v. Squillace*, 143 F.3d 653 (2d Cir. 1998), the "most serious charge" in a misbehavior report that includes charges of creating a disturbance, making threats, and refusing a direct order is the direct order charge.  *Hynes*, 143 F.3d at 655, 657.  Here, Plaintiff admits that he did not put on his coat when Defendant Nephew ordered him to do so.  (Dkt. No. 1 ¶ 15.)  Thus, Defendants have met their burden of showing that Plaintiff would have received the same punishment even absent the allegedly retaliatory motive by demonstrating that there is no dispute that Plaintiff committed the most serious of the prohibited conduct charged in the misbehavior report.  Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the retaliation claims against Defendants Nephew, Desotelle, and Snyder arising from the January 2, 2003, misbehavior reports.

The misbehavior report by Defendant Wright charged Plaintiff with committing an unhygenic act, harassment, and threats.[51]  (Dkt. No. 92-5, Ex. 11.)  The most serious of these charges was the threat charge.

Plaintiff admits that when Defendant Wright asked him to explain what happened in the frisk room, Plaintiff "responded that Wright would not believe his account of the incident, that Wright had unjustifiably interfered with [his] court trip . . . and that [Plaintiff] would sue Wright and Snyder for their unlawful acts and actions."  (Dkt. No. 1 ¶ 16.)  This is certainly an admission to the harassment charge.  DOCS Rule 107.11 provides as follows: "An inmate shall

---

[51]     Although Defendants assert that Wright charged Plaintiff with disobeying a direct order, the evidence before the court does not support that assertion.  (Dkt. No. 92-5, Exs. 11-12.)

not harass an employee or any other person verbally or in writing.  Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures."  N.Y. Comp. Codes R. & Regs., tit. 7, § 270.2(B)(8)(ii).  However, it is not an admission to the threat charge, which requires that "[i]nmate[s] shall not . . . make any threat, spoken, in writing, or by gesture."  N.Y. Comp. Codes R. & Regs., tit. 7, § 270.2(B)(3)(I).  Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the retaliation claim against Defendant Wright.

> 5.    <u>Failure to Intervene</u>

Plaintiff alleges that Defendant Bezio violated his constitutional rights by failing to intervene to protect Plaintiff from Defendants Duprat, Bogett, and Snyder.  (Dkt. No. 1 ¶¶ 19-20.)  Defendants move for summary judgment, arguing that there was no underlying constitutional violation with which to intervene.  (Dkt. No. 92-10 at 36-37.)

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights.  *Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501, 512 (S.D.N.Y. 2008) (citation omitted).  A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene."  *Id.* (citation omitted); *see also Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) ("Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability.").  Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide.

*See Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a jury could determine that Defendant Bezio failed to intervene to protect Plaintiff. Plaintiff's verified complaint states that on the day before the incident he asked Defendant Bezio to protect him while he was being transported to court. (Dkt. No. 1 ¶ 19.) Plaintiff alleges that Defendant Duprat made a threatening comment as he escorted Plaintiff to the transportation van and that Plaintiff informed Defendant Bezio of the threat before they reached the van. (Dkt. No. 1 ¶ 20.) Defendant Bezio merely shrugged his shoulders. *Id*. None of the defendants has filed an affidavit contradicting Plaintiff's version of events. As discussed above, there is a triable issue of fact that a constitutional violation occurred with which Defendant Bezio could have intervened. Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the failure to intervene claim against Defendant Bezio.[52]

  6. <u>Grievances</u>

Plaintiff alleges that Defendants Brousseau, Donelli, Girdich, and Eagen violated his constitutional rights by refusing to allow him to file a grievance regarding the events of January 2 and 3, 2003. (Dkt. No. 1 ¶¶ 30-34.) Defendants move for summary judgment, arguing that Plaintiff has not stated a constitutional claim. (Dkt. No. 92-10 at 38.) As discussed above in

---

[52] Read broadly, the complaint asserts a retaliation claim against Defendant Bezio based on these same events and a failure to intervene claim against Defendant Duprat because he was present when Defendant Snyder initially beat Plaintiff. (Dkt. No. 1 ¶ 21.) Defendants have not moved for summary judgment of these claims. I find that these claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

Section III(B)(3), Defendants are correct.  Therefore, I recommend that the Court grant Defendants' motion and dismiss the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding the handling of Plaintiff's grievances.

**D.    Disciplinary Hearing/Sentence**

Plaintiff raises several claims regarding the conduct of his disciplinary hearing, his disciplinary sentence, and his appeal of the sentence.  Specifically, he claims that (1) Defendant LaClair violated his right to due process by falsifying a misbehavior report against Plaintiff to avoid serving as Plaintiff's pre-hearing assistant (Dkt. No. 1 ¶ 35); (2) Defendant Bullis violated his due process rights by failing to call an inmate and Defendant LaClair as witnesses (Dkt. No. 1 ¶¶ 36-37); (3) Defendant Bullis violated his Eighth Amendment rights by sentencing him to a 21-day loaf diet (Dkt. No. 1 ¶ 36-37) and Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the loaf diet (Dkt. No. 1 ¶ 38); and (4) Defendant Selsky violated Plaintiff's right to due process by affirming Defendant Bullis' disposition (Dkt. No. 1 ¶ 40).

1.    <u>LaClair</u>

Plaintiff alleges that Defendant LaClair falsified a misbehavior report against him in order to avoid serving as Plaintiff's pre-hearing assistant "and for the purpose of depriving Benitez of due process."[53]  (Dkt. No. 1 ¶ 35.)

---

[53]    The only version of the events between Defendant LaClair and Plaintiff in evidence before the Court is Defendant LaClair's misbehavior report.  According to that report, when Defendant LaClair went to Plaintiff's cell to assist him, Plaintiff "stated . . . that [LaClair] was to get [him] what he wanted."  Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up."  Defendant LaClair "informed him the interview was over and left the area."  (Dkt. No. 92-5, Ex. 15 at 2-3.)  Although Plaintiff states in his verified complaint that Defendant LaClair

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law.  *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000).

Punishment implicates a protected liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular punishment; and (2) the punishment imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995); *Tellier*, 280 F.3d at 80; *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996).

Here, no liberty interest is implicated.  As a result of being found guilty of the disciplinary charges, Plaintiff was sentenced to a loaf diet.  The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss.  *McEachin v. McGuinnis*, 357 F.3d 197 (2d Cir. 2004).  Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant LaClair.[54]

_____

"intentionally and maliciously falsified" the report, he does not offer any other version of what happened.  (Dkt. No. 1 ¶ 35.)  He alleges that he asked Defendant Bullis to "interview inmate Rolan and LaClair regarding the acts and actions of LaClair that caused him not to provide Benitez pre-hearing assistance," but he does not provide any information about what those interviews might have revealed.  (Dkt. No. 1 ¶ 36.)  Due to Defendants' failure to provide Plaintiff with pages of the SHU log book for January 14, 2003, Plaintiff asks the Court to draw an adverse inference that "were Defendants to provide the Court with the missing pages of the . . . log book . . . such pages would not support any of the allegations of misconduct set out in the misbehavior report that LaClair filed against Benitez on that date."  (Dkt. No. 109 at 41 n.14.)  Plaintiff does not explain, however, why such an inference is logical.

[54]     Although Defendants argue, in regard to Plaintiff's other claims regarding his disciplinary hearing, that due process was not required because no liberty interest was implicated by the imposition of the loaf diet, they did not assert that argument regarding the claim against Defendant LaClair.  Rather, Defendants argue that Plaintiff waived Defendant LaClair's

2.      Failure to Call Witnesses

Plaintiff alleges that Defendant Bullis violated his right to due process by failing to call

the witnesses that Plaintiff requested.  (Dkt. No. 1 ¶ 37.)  Defendants move for summary

judgment, arguing that Plaintiff cannot state a due process claim because he was not deprived of

a liberty interest.  (Dkt. No. 92-10 at 39-40.)  As discussed above, Defendants are correct.

*McEachin*, 357 F.2d at 200.  Therefore, I recommend that the Court grant Defendants' motion for

summary judgment and dismiss this claim.

3.      Imposition of Loaf Diet

Plaintiff alleges that Defendant Bullis violated his Eighth Amendment rights by imposing

the loaf diet on him and that Defendants Weissman and Girdich violated his Eighth Amendment

rights by approving the punishment.  (Dkt. No. 1 ¶¶ 37-38.)  Defendants move for summary

judgment of the claim, arguing that (a) Plaintiff failed to exhaust his administrative remedies;

and (b) Defendants were not deliberately indifferent.  (Dkt. No. 92-10 at 14-20.)

---

assistance by threatening him.  (Dkt. No. 92-10 at 38-39.)  Due process requires that prison officials provide pre-hearing assistance to a prisoner facing disciplinary charges who is confined to the SHU.  *Eng v. Coughlin*, 858 F.2d 889 (2d Cir. 1988).  "An assistant's role is to act as merely a surrogate for the inmate, not a legal advisor or advocate. [A]n assistant's role is to perform tasks like interviewing witnesses that the inmate would perform himself if her were in the general population."  *Jackson  v. Johnson*, 30 F. Supp. 2d 613, 619 (S.D.N.Y. 1998)(citations and punctuation omitted).  The assistance "must be provided in good faith and in the best interests of the inmate."  *Ayers v. Ryan*, 152 F.3d 77, 81 (2d Cir. 1998) (citation omitted).  An "assigned assistant who does nothing to assist a . . . prisoner . . . has failed to accord the prisoner his limited constitutional due process right of assistance."  *Eng*, 858 F.2d at 898.  Defendants cite several cases holding that an inmate may waive his right to assistance by remaining silent when assistance is offered or by refusing to sign a form requesting assistance.  (Dkt. No. 92-10 at 39, citing *inter alia, Jackson*, 30 F. Supp. 2d at 619.)  However, Defendants have not cited any cases holding that an inmate waives his right to assistance by threatening his assistant.  In light of my finding that Plaintiff was not deprived of a liberty interest, it is not necessary to reach this issue.

a.      *Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff did not exhaust his administrative remedies regarding his Eighth Amendment claims against Defendant Bullis because he did not appeal the grievance he filed regarding Defendant Bullis' imposition of the loaf diet to the CORC.  (Dkt. No. 92-10 at 14.)  Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his Eighth Amendment claim against Defendants Weissman and Girdich because he did not file a grievance at all.  (*Id.* at 15.)

DOCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process.  N.Y. Comp. Codes R. & Regs. tit.7, § 701.3(e)(1)-(2).   For Tier III superintendent hearings, such as Plaintiff's, the inmate must file an  appeal with Donald Selsky, DOCS Director of Special Housing/Inmate Disciplinary Program, pursuant to New York Compilation of Codes, Rules and Regulations, title 7, section 254.8.  The appeal must be filed within 30 days of the inmate's receipt of the hearing officer's written disposition.  N.Y. Comp. Codes R. & Regs. tit.7, § 254.8.  Plaintiff raised the issue of the loaf diet in his appeal of the disciplinary sentence.  (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, Ex. D.)  Defendant Selsky denied the appeal.  *Id*. at Ex. E.  Therefore, Plaintiff exhausted his administrative remedies as to his claim against Defendant Bullis.

Plaintiff declares that on January 18, 2003, he submitted a grievance to Defendant Brousseau complaining about Defendant Bullis' imposition of, and Defendants Weissman and Girdich's approval of, the loaf diet.  (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, ¶ 26.)  He declares that Defendant Brousseau "deliberately refused to file and process the grievance . . . in order to prevent me from suing the officials named in the grievance."  *Id*. ¶ 27.  Therefore, as

57

discussed above, there is a question of fact that Defendants are estopped from asserting the exhaustion defense.

     *b.*     *Deliberate Indifference*

Defendants argue that Plaintiff has not raised a triable issue of fact that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they ordered and approved that the loaf diet be imposed on Plaintiff. (Dkt. No. 92-10 at 15-20.) Defendants are correct.

Where a prisoner claims that punishment imposed following a disciplinary hearing violates his Eighth Amendment rights, the proper analysis of the subjective prong of the claim requires the court to "consider whether the [o]rder was reasonably calculated to restore prison discipline and security and, in that . . . context, whether the officials were deliberately indifferent to [the prisoner's] health and safety." *Trammell v. Keane*, 338 F.3d 155, 163 (2d Cir. 2003).

Here, the order imposing the loaf diet on Plaintiff was reasonably calculated to restore prison discipline and security. DOCS regulation allow the imposition of the loaf diet as punishment where, *inter alia*, the inmate is found guilty of committing unhygenic acts in the SHU or the inmate is a long-term SHU inmate who is disruptive and who has lost all other available privileges. (Dkt. No. 92-8, Bezio Aff., ¶ 5.) Here, Plaintiff was found guilty of committing unhygenic acts in the SHU. Moreover, Plaintiff is a long-term SHU inmate (he will remain in the SHU until June 3, 2021, and in keeplock until July 1, 2025) who has lost package, commissary, and phone privileges and has lost 11 years worth of good time credits. (Bezio Aff., ¶ 6.) Therefore, the imposition of the loaf diet was reasonably calculated to restore prison discipline.

There is no evidence that Defendants Bullis, Weissman, and Girdich acted with deliberate

indifference when they imposed and approved of the loaf diet.  To establish deliberate indifference, an inmate must prove that (1) the defendant was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the defendant actually drew that inference.  *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702-703.  Here, although Plaintiff told Defendant Bullis that the loaf diet would cause him severe abdominal pains and constipation due to his hepatitis (Dkt. No. 1 ¶ 36), his medical record did not support his assertion.  Dr. Weissman declares that "there is nothing in his medical record that indicates that [Plaintiff] is medically unable to receive the restricted diet penalty . . . [T]he fact that [P]laintiff is Hepatitis C positive does not mean he cannot receive the restricted diet because Hepatitis C is not a contraindication for the restricted diet."  (Weissman Aff. ¶¶ 14-15.)  Thus, there is no evidence in the record indicating that Defendants Bullis, Weissman, and Girdich were aware of facts from which the inference could be drawn that the loaf diet would harm Plaintiff or that they drew that inference.  Moreover, Plaintiff admits that he refused to eat the loaf diet.  (Dkt. No. 1 ¶ 39.)  Accordingly, any weight loss and pain that he experienced could not have resulted from the loaf diet itself.  Accordingly, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's Eighth Amendment claims against Defendants Bullis, Weissman, and Girdich.

     4.    <u>Selsky</u>

Plaintiff alleges that Defendant Selsky affirmed Defendant Bullis' "disciplinary determination, even though he knew or should have known that Bullis violated [Plaintiff]'s clearly established due process rights."  (Dkt. No. 1 ¶ 40.)  Defendants' motion for summary judgment does not directly address this claim.  However, I find that it is subject to *sua sponte*

dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B) because, as discussed above, Defendant Bullis

did not violate Plaintiff's due process rights.  Therefore, I recommend that the Court dismiss the

claim against Defendant Selsky.

### E.      Five Points Health Care

Plaintiff alleges that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his

Eighth Amendment rights by failing to provide adequate medical care at Five Points Correctional

Facility following the alleged beating by Defendants Snyder, Duprat, and Bogett.  (Dkt. No. 1 ¶¶

23-26.)  Defendants move for summary judgment, arguing that (1) Plaintiff failed to serve

Defendant Kuhlman; and (2) Plaintiff cannot raise a triable issue of fact that these Defendants

violated his Eighth Amendment rights because Plaintiff did not suffer from a serious medical

need and Defendants were not deliberately indifferent.  (Dkt. No. 92-10 at 6, 20.)

### 1.      Failure to Serve Defendant Kuhlman

Defendants argue that the claim against Defendant Kuhlman must be dismissed because

she was not served within 120 days of the filing of the amended complaint on October 6, 2004.

(Dkt. No. 92-10 at 6.)  Under the Federal Rules of Civil Procedure, a defendant must be served

with the summons and complaint within 120 days[55] after the filing of the complaint.  Fed. R. Civ.

P. 4(m).  The court "must" extend the time for service for an appropriate period if the plaintiff

shows good cause for the failure to serve.  *Id*.

Here, on June 24, 2005, the summons was returned unexecuted as to Defendant

---

[55]      This 120-day service period is shortened, or "expedited," by the Court's Local
Rules of Practice (and the Court's General Order 25), which provide that all defendants must be
served with the summons and complaint within sixty (60) days of the filing of the complaint.
N.D.N.Y. L.R. 4.1(b) (emphasis added).

"Coleman."  (Dkt. No. 21.)  On May 22, 2007, the Clerk's office sent Plaintiff a letter informing

him that the Marshals Service had not been able to serve the defendant because there was no one

by that name at Five Points Correctional Facility.  The Clerk's office provided Plaintiff with

another USM-285 form and asked for more information about the defendant.  (Dkt. No. 54.)

Plaintiff states that he was not able to ascertain Defendant Kuhlman's correct identity until after I

issued orders on May 2, 2007, and October 3, 2007, compelling defendants to respond to

discovery.  (Dkt. No. 109 at 7-8.)  The docket shows that on January 31, 2008, Plaintiff

attempted to file an amended complaint "correctly identif[ying] defendant Kulhman by

substituting the name 'Coleman' . . . for 'Kuhlman.'" (Dkt. No. 74.)  On February 4, 2008, I

ordered Plaintiff's motion stricken from the record because the deadline for filing motions to

amend had expired on January 30, 2006.  (Dkt. No. 75.)  I find, therefore, that Plaintiff has

demonstrated good cause for his failure to serve Nurse Kuhlman.

     2.    <u>Merits</u>

Plaintiff claims that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his

Eighth Amendment rights by refusing to treat him for head pain, pain in his liver, pain in his left

wrist, and severe body itch.  Plaintiff also alleges that he informed Defendant Hensel that "he had

. . . lost blood from within his right ear."  (Dkt. No. 1 ¶¶23-26.)  Defendants argue that Plaintiff

has not raised a triable issue of fact as to either the objective or subjective prong of his Eighth

Amendment medical care claim.  (Dkt. No. 92-10 at 20.)

As discussed above, the objective prong of an Eighth Amendment medical claim requires

the court to determine whether the prisoner was deprived of adequate medical care and, if so,

whether the inadequacy was sufficiently serious.  *Salahuddin*, 467 F.3d at 279-80.  Where the

prisoner alleges that he was completely deprived of treatment, the court must examine whether

the inmate's medical condition is sufficiently serious.  *Id*. at 280.  Here, because Plaintiff alleges

that he was totally deprived of medical care, I must consider whether the bleeding in his inner

right ear, head pain, pain in his liver, pain in his left wrist, and severe body itch are "serious

medical conditions," in other words, whether they are conditions "of urgency that may produce

death, degeneration, or extreme pain."  *Id*.; *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir. 1990)

(Pratt, J. dissenting).

Defendants argue, without analysis, that none of Plaintiff's "conditions constitute a

condition of urgency, one that may produce death, degeneration, or extreme pain."  (Dkt. No. 92-

10 at 20.)  As discussed above in regard to Plaintiff's claims against Defendant Weissman and

Richardson, I agree that Plaintiff's severe body itch is not a serious medical condition.  However,

Plaintiff's bleeding inner ear, head pain, and liver pain, as alleged, appear urgent and capable of

producing extreme pain.  *See Bjorkstrand v. DuBose*, No. CIV. S-08-1531, 2008 WL 5386637, at

* 3 (E.D.Cal. Dec. 24, 2008)(finding that dried blood in ear was not a serious medical condition

because "there was no emergency problem with the left ear, such as active bleeding.").  I

therefore find that Defendants have not met their burden of showing that they are entitled to

judgment as a matter of law on the issue of whether Plaintiff suffered from a serious medical

condition.

Defendants argue that Plaintiff cannot raise a triable issue of material fact as to deliberate

indifference because the issue of "[w]hether or not [P]laintiff needed treatment or to be seen by a

physician amounts to nothing more than a disagreement with the course of treatment - not

deliberate indifference."  (Dkt. No. 92-10 at 20.)  As Plaintiff notes (Dkt. No. 109 at 37), none of

the named Five Points Defendants has filed an affidavit supporting Defendants' motion for summary judgment. They have therefore not established that their treatment of Plaintiff was based on their medical judgment. The evidence, when viewed in the light most favorable to Plaintiff, indicates that he arrived at Five Points on January 3 complaining of severe pain inflicted through excessive force and that he received absolutely no treatment for his injuries until Nurse Gardner examined him on January 7. Therefore, I find that Plaintiff has raised a triable issue of fact that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment right to adequate medical treatment.

**ACCORDINGLY**, it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 92) be **GRANTED IN PART AND DENIED IN PART**; and it is further

**RECOMMENDED** that the following claims be dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet; and it is further

63

**RECOMMENDED** that the following claims be dismissed *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky; and it is further

**RECOMMENDED** that the following claims survive summary judgment and *sua sponte* review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello; and it is further

**ORDERED** that the Clerk provide Plaintiff with Form USM 285 for service on Defendant Kuhlman; and it is further

**ORDERED** that the Clerk serve copies of *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, 2008 WL 1787692  (E.D.N.Y. Apr. 17, 2008); *Odom v. Poirier*, No. 99 Civ. 4933, 2004 U.S. Dist. LEXIS 25059,  2004 WL 2884409 (S.D.N.Y. Dec. 10, 2004); *Warren v. Purcell*, No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792,  2004 WL 1970642 (S.D.N.Y. Sept. 3, 2004); *Bond v. Board of Educ. of City of New York*, 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, 1999 WL 151702 (W.D.N.Y. Mar. 17, 1999); *Medina v. Hunt*, No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept. 25, 2008); *Hill v. City of New York*, No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005); and *Mendez v. Artuz*, No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, 2002 WL 313796

(S.D.N.Y. Feb. 27, 2002) on Plaintiff in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.

**<u>FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


Dated: September 30, 2009
      Syracuse, New York

                                   George H. Lowe
                                 United States Magistrate Judge